[Civ. No. 56282. Second Dist., Div. Four. May 19, 1981.]

NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY, Plaintiff, Cross-defendant and Respondent, v. FAYLEASE EDWARDS et al., Defendants, Cross-complainants and Appellants.

**COUNSEL**

Marcus Kalb, Barnet M. Cooperman and Martin B. Berman for Defendants, Cross-complainants and Appellants.

John C. Morrow for Plaintiff, Cross-defendant and Respondent.

**OPINION**

**WOODS, J.**—The National Life and Accident Insurance Company (hereinafter referred to as National) filed a complaint in interpleader

against appellants Faylease Edwards and Johnnie M. Glass. Under the terms of the complaint, respondent paid into court the sum of $8,365.96 as the death benefit due on the life of the insured, William C. Edwards, and asked the court to determine the ·respective rights of the rival claimants, Edwards and Glass.

Thereafter, both Edwards and Glass filed cross-complaints claiming that an additional $8,000, over and above the sum deposited into court by respondent, was due and owing by respondent under a double-indemnity section of the policy of life insurance.

Respondent moved for summary judgment or, in the alternative, for summary adjudication by the court that no additional sums were due· under the double-indemnity provision of this policy in that the death occurred more than 90 days after the injuries were sustained.

On March 27, 1978, summary judgment was granted as to the double-indemnity provisions, the court holding that the amount due under the policy was $8,000 plus interest and that no additional sums were payable by reason of the accidental death because the decedent died more than 90 days after the date on which the injuries were sustained.

Proceedings on the remaining issues of the litigation were continued to September 6, 1978, in order to allow appellants to pursue their rights through extraordinary writ procedure.

Following denial of appellants' petition for writ of mandamus, the matter proceeded to trial on the remaining issues. Appellants Glass and Edwards stipulated that they would each receive one-half of all sums collected under this policy, including any monies that may be collected under the double-indemnity portion of the policy. The case proceeded to trial on the tort actions of each of the appellants against National for bad faith refusal to pay benefits and fraud. After opening statements, National's motion for nonsuit on the cross-complaints of Glass and Edwards was argued and granted.

I

William Charles Edwards, now deceased, purchased a family life insurance policy insuring his life, the life of appellant Edwards, his wife,

and the lives of their minor children. At the time the policy was issued, Mr. Edwards was 24 years of age.

The policy was in the face amount of $4,000 and had additional coverage in the amount of $4,000 if the death of the insured occurred within 10 years following the issuance of the policy, and further contained a provision for payment of an additional sum of $8,000 in the event that the insured died as a result of injuries sustained in a vehicular accident, if the death occurred within 90 days from the date on which the injuries were sustained.

On March 2, 1974, Mr. Edwards was involved in a motor vehicle accident, as a result of which he was rendered a quadriplegic. He died on March 22, 1976. It was stipulated by the parties that the disabling effects of the injuries sustained in the accident were continuous until and including March 22, 1976. There was a chronological lapse of 751 days between the date of the accident in which the injuries were sustained and the date of death. The cause of death as stated on Mr. Edwards' death certificate was bilateral bronchopneumonia as a consequence of a spinal cord injury due to blunt force trauma.

Mr. and Mrs. Edwards had separated in October of 1971, prior to the accident, and did not thereafter live together. Mrs. Edwards, the appellant herein, paid all of the premiums on the subject insurance policy from its inception through October 1974, following which, by the terms of the policy, premiums were waived by reason of the total disability of Mr. Edwards. The insured wife, appellant Edwards, was the named and designated primary beneficiary and successor owner under the policy.

In October of 1974, appellant Glass forwarded a letter to respondent National enclosing a general power of attorney form. The letter attempted to change the beneficiary of the subject policy from the insured's wife to his aunt, appellant Glass. The letter was signed by appellant Glass as attorney in fact and also contained an X mark purportedly affixed by William C. Edwards. No action was taken by respondent to change the beneficiary.

## II

The issues presented on appeal are:

1. Whether benefits are payable under a double-indemnity clause of a life insurance policy when death follows from an accidental injury with-

in such time as the processes of nature consume in causing death, notwithstanding the fact that the death occurs subsequent to a time limitation specified in the policy; and

2. Whether the failure of an insurance company to effectuate a requested change of beneficiary in a life insurance policy gives rise to an action for breach of an implied covenant of good faith and fair dealing.

## III

On appeal we are asked to consider whether the trial court, after observing that there were no California cases in point, erred in refusing to apply the "process of nature" rule to defeat the clause in this insurance policy which resulted in no additional benefits being paid by reason of Mr. Edward's accidental death, because he died more than 90 days after the date on which the injuries were sustained.

The process of nature rule, created by judicial decisions in other states, was first applied in California in *Frenzer* v. *Mutual Ben. H. & A. Assn.* (1938) 27 Cal.App.2d 406 [81 P.2d 197], and has since been confirmed as the law of the State of California, but its application has thus far been limited to disability policies in California.

"The 'process of nature' rule holds that, within the meaning of policy provisions requiring disability within a specified time after the accident, the onset of disability relates back to the time of the accident itself whenever the disability arises directly from the accident ... 'within such time as the process of nature consumes in bringing the person affected to a state of total [disability].' (*Schilk* v. *Benefit Trust Life Ins. Co.* (1969) 273 Cal.App.2d 302, 307 ....)" (*Willden* v. *Washington Nat. Ins. Co.* (1976) 18 Cal.3d 631, 635 [135 Cal.Rptr. 69, 557 P.2d 501].)

The rationale for the rule is best set forth in *Rathbun* v. *Globe Indemnity Co.* (1921) 107 Neb. 18 [184 N.W. 903], wherein the court pointed out that it was a matter of common knowledge that in a large majority of instances in which bodily injuries are received, the real nature and extent of injuries are not revealed until sometime in the future and after the first pains have passed away. The court said: "The injured part often lies dormant for an indefinite period, with but little or no consciousness of its existence by the person injured, although from the

very moment of the accident, perhaps, the processes of nature may be busily engaged in developing what may have seemed to be but a slight hurt into a most serious and perhaps fatal injury." (*Id.*, at p. 908.) The weight of authority is that in such instances the disability is held to be continuous from the date of the accident.

The process of nature rule has been applied to a head injury seemingly minor at first, but subsequently causing the impairment of vision and of mental coordination followed by paralysis. (*Booth v. United States Fidelity & Guaranty Co.* (1925) 3 N.J. Misc. 735 [130 A. 131].)

In support of the process of nature rule it has been argued that injuries such as blood poisoning, which cannot disable without some lapse of time, would otherwise not be covered at all; that serious internal injuries often do not manifest themselves for a long time; that an opposite result would amount to saying that no time would be allowed for the development of an injury directly traceable to an accident; and that a strict and literal interpretation of a policy provision requiring that disability be immediate or from the date of the accident, or follow the accident within a specified number of days, would lead to an unjust result and would unreasonably restrict the coverage of the policy. (Annot. (1971) 39 A.L.R.3d 1026, 1034.)

Although there is a substantial and growing body of law applying the process of nature rule to disability policies, the courts have shown reluctance in extending this concept to time limitations in double-indemnity provisions of life insurance policies.

"The courts have uniformly upheld insurance policy provisions limiting coverage to death that occurred within a specified number of days after an accident that caused the death. Thus, where a policy covered death resulting within 90 days from accidental injury, a court has ruled that the language of the policy required computation from the time of the accident, including the day of the accident." (Annot. (1971) 39 A.L.R.3d 1311, 1315.)

In *Brown v. United States Casualty Co.* (N.D.Cal. 1899) 95 F. 935, Brown, the insured, sustained serious injuries upon being thrown from a dog cart and died beyond the time specified in the policy. The insurer admitted the accident was the sole cause of death but denied liability. The court found the time limitation to be reasonable, clear and unambiguous, and a bar to recovery. The court advanced two theories for its

conclusion, both of which have been relied upon heavily by succeeding cases. The first is that the insured had contracted for the insurance with full awareness of the 90-day limitation. We reject this as grounds for enforcing such time limitations because in cases such as the one before us, there is no basis for believing that the time period stated was reached by a process of negotiation between the parties. The double-indemnity agreement is a classic example of a contract of adhesion in which the deceased insured had no opportunity to bargain and no opportunity to render the provision inapplicable. There is a standard time limitation which the individual accepts if he desires the accidental death protection. It cannot be said that the time limitation was voluntarily contracted for.

The *Brown* court's second basis for determining the time limitation to be reasonable was that "from experience and the statistics on the subject, 90 days has been decided to be a fair length of time for the final result of an accident; . . ." (*Brown, supra*, 95 F. at p. 937.) This premise must also be rejected. Obviously, the advance in modern medicine, since this rationale was first expounded in 1899, has been so spectacular as to make the statement of the rule ridiculous. This was dramatically demonstrated in *Burne* v. *Franklin Life Insurance Company* (1973) 451 Pa. 218 [301 A.2d 799]. In *Burne*, the insured sustained severe injuries as a result of an automobile accident, and his life was prolonged four and one-half years by the use of the most sophisticated medical techniques and life support systems. The court discussed the anguish of a family that might be forced to decide whether to allow an accident victim to die, and thus be within the 90-day clause of the life insurance policy, or to employ these life-extending techniques with the resultant loss of the additional insurance coverage. The Pennsylvania Supreme Court concluded that as a matter of public policy the 90-day limitation was unenforceable in circumstances where no question existed as to the insured's cause of death.

This court does not find it necessary to hold that such clauses are invalid as a matter of public policy. It is simply a reasonable extension of the process of nature rule, already the law in California, that it be applied to the time limitation in the double-indemnity provision of accidental death policies.

Another argument, upon which the courts have relied to enforce these time limitations in accidental death policies, is that they were intended

to provide a method for dealing with questions that might arise over the insured's cause of death. It has been reasoned that, if the death occurred beyond the time specified in the policy, it could, in all likelihood, be attributed to either prior or intervening causes. Again, focusing on the advance of modern medicine, logic dictates that where, as in the case before us, the insurer has not conceded that the accident was the sole cause of death, the court must admit evidence on actual causation rather than rely on some arbitrary time limitation. This policy clearly puts the burden on the claimant to prove that death occurred as a direct and exclusive result of the accident.[1]

We know that Mr. Edwards' death certificate listed the cause of death as the accident and the resulting spinal cord injury together with resulting bronchopneumonia. Dorland's Medical Dictionary defines bronchopneumonia as an inflammation of the lungs which usually infects infants or debilitated persons of any age. It is for a jury to determine whether this medical evidence is sufficient to establish clearly the automobile accident was the sole cause of Mr. Edwards' death.

We do not agree with those decisions in other jurisdictions which have upheld the time limitation as a suitable substitute for actual determination of the insured's cause of death. We find no basis in logic for doing so. This court is aware of no actuarial or statistical basis for the arbitrary selection of the 90-day period.

There are those who will decry this opinion for failing to set forth some time limitation. The limitation that justice and logic dictates is the ability to prove the causal relationship between the accident and the death. The contract is to pay benefits if a death by accidental means is established. It is our intention to enforce the existing contract of insurance not to write a new contract for the parties.

---

[1]Mr. Edwards' policy provided: No such benefit (accidental death) shall be payable upon the death of the insured when the insured's death resulted directly and independently of all other causes from bodily injuries effected solely through external, violent and accidental means, subject to these additional conditions and limitations: (a) death contributed to by disease or mental infirmity, or medical or surgical treatment thereof, (b) and not the result of insurrection or war, (c) nor an attempt to commit an assault or felony, (d) or an intentional act of another if provoked by insured, (f) or an aircraft accident, (e) drag racing or willful violation of traffic laws, or (f) riding as a fare paying passenger in a public conveyance or school bus.

In *INA Life Ins. Co.* v. *Com., Ins. Dept.* (1977) 31 Pa. Commw. Ct. 416 [376 A.2d 670, at page 674], the court said: "INA's contention that such a time limit is necessary to protect it from having to pay benefits on doubtful claims ignores the fact that in all instances when a claim is filed, it is the claimant's burden to prove entitlement to benefits. If the passage of time obscures the cause of death, the claimant's burden becomes all the heavier." A claim may be defeated by remoteness alone, if this factor causes the finder of fact to conclude that a causal connection between the accident and the death has not been established by a preponderance of the evidence.

We reject the argument of appellants' counsel that the time limitation herein discussed is ambiguous. The language and intent of the clause is clear. We conclude, however, that this matter should have been allowed to proceed to trial with an appropriate instruction as to the process of nature rule, and that the trial court erred in concluding as a matter of law that this rule was not applicable to the double-indemnity provision herein presented.

### IV

The claims of "bad faith" urged by appellants are by stipulation limited to those facts set forth in the opening statements upon which the nonsuit was entered.

Turning first to the appeal of Johnnie Glass, the facts relied on are that, on October 19, 1974, the following letter was mailed to the local office of National:

"Los Angeles, Calif. 90003
130 E. 99th St.,
October 19, 1974

"National Life Insurance And Accident
Company,
Supervisor,
10701 S. Vermont Ave.,
Los Angeles, California.

"Re: Policy #71553419

"Sirs:

"I am writing you concerning the following: —

"a—Since I am totally disabled, I am expecting a refund shortly on my Insurance Policy.

"b—This refund is not to be given to any one else, except to me. Should this refund be given to any one except me, I will personally hold your Company financially liable to me.

"c—I would like to know, whether or not I have another policy, besides this one.

"II

"d—I wish to have my beneficiary changed immediately to—Mrs. Johnnie M. Glass, 8800 Zamora Avenue, Los Angeles, California, 90002, and her telephone number is 587-5691. Her relationship to me is, she's my aunt.

"e—My aunt, has power of attorney, to sign all papers, checks or documents in my behalf

> Very truly yours
> X William C. Edwards
> By Johnnie M. Glass
> Atty In Fact"

The insurance policy has the following provision with respect to change of beneficiary: "The owner may change the beneficiary by filing written request for the change at the home office of the company. No such change shall be effective until endorsed by the company on the policy. When so endorsed, the change shall be effective as of the date the request was signed, whether or not the insured is living when the change is endorsed, subject to any payment made or other action taken by the company before such endorsement. A change of beneficiary shall in no way affect the rights of any assignee under any assignment existing on the effective date of such change."

It is apparently conceded by the insurer that the letter requesting change of beneficiary together with a copy of the power of attorney

was received at the Los Angeles office of National, but not received at the home office until after the death of Mr. Edwards. It is contended that, after two or three weeks had passed, Mrs. Glass, who had heard nothing from National, took copies of the letter dated October 19, and the power of attorney, to the same local office of National to which the letter had been mailed.

There was no suggestion made in the opening statement that any representations were made to Mrs. Glass that this request would be acted upon nor even that she spoke to anyone in the office at that time. National did refund the premiums requested in the letter but nothing was done to effectuate a change of beneficiary. National was apparently not contacted again by Mrs. Glass or by anyone on behalf of Mr. Edwards with regard to a change of beneficiary until after his death some 17 months after the initial request had been mailed.

It is suggested on behalf of appellant Glass that the inaction by National was not oversight but deliberate, based upon its suspicions that she had unduly influenced Mr. Edwards. Her allegation of bad faith and unfair dealing is based on the fact that National failed to investigate their suspicions or otherwise act when the request for change of beneficiary was received.

Both appellants devote much of their brief to the duty owed by the insurer to third-party beneficiaries under the policy. We prefer to address the threshold issue of whether the failure of National's district office to forward this request for change of beneficiary to the home office, or otherwise act on the request, constitutes a breach of its covenant of good faith and fair dealing.

The cases that have dealt with the covenant of good faith and fair dealing have for the most part been cases involving the insurer's duty to accept reasonable settlement or duty not to unreasonably withhold payments due under the policy. (*Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329]; *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141]; *Austero* v. *National Cas. Co.* (1978) 84 Cal.App.3d 1 [148 Cal.Rptr. 653]; *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452 [113 Cal.Rptr. 711, 521 P.2d 1103].) And in *Davis* v. *Blue Cross of Northern California* (1979) 25 Cal.3d 418 [158 Cal.Rptr. 828, 600 P.2d 1060], the court found a violation of fair dealing where the insurer

adopted a course of conduct for the purpose of inducing subscribers to give up their rights to arbitration under the insurance contract.

■ As set forth in *Egan*: "In addition to the duties imposed on contracting parties by the express terms of their agreement, the law implies in every contract a covenant of good faith and fair dealing. [Citations.] The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. [Citations.] The precise nature and extent of the duty imposed by such an implied promise will depend on the contractual purposes." (*Egan, supra*, 24 Cal.3d at p. 818.) ■ The court went on to state that the insurer must give at least as much consideration to the insured's interest as it does to its own. Or as stated in *Austero v. National Cas. Co., supra*, 84 Cal.App.3d 1, the ultimate duty imposed under the implied covenant of good faith and fair dealing is that neither party will do anything to deprive the other of the benefit of the agreement. (*Austero, supra*, at p. 27.)

■ When we apply this test to the conduct of National in the case before us we conclude that while the failure of the carrier to take affirmative action in response to the insured's letter requesting a change of beneficiary may have constituted negligent behavior, it has not been shown to be unreasonable behavior as defined by the cases and did not constitute a violation of the covenant of fair dealing.

There is no evidence alluded to in the opening statement of either appellant which supports a finding of more than negligent conduct on the part of the insurer in failing to act.

■ Appellant Edwards alleges that she was assured by National's agent that she would be maintained as a beneficiary on the policy, as the wife of the insured. She contends that National had an affirmative duty to resolve any conflict of claims as between beneficiaries at the time the request for change of beneficiary was received by their agent; that the refusal of National to pay her the policy benefits upon the death of her husband was a violation of National's covenant of good faith and fair dealing. We disagree. Appellant Edwards was the named beneficiary in the policy and National took no action to change her status. Appellant has demonstrated no conduct on the part of National which would support her allegation of bad faith.

A bad faith action cannot be predicated upon National filing an interpleader unless there was a showing that the claims of the interpleading parties were not asserted in good faith. There has been no such showing here. "[T]he filing of an interpleader or payment into court by the insurer can be construed only as a recognition of liability to the rightful claimant and as a measure taken to protect the insurer against a double liability." (*Pimentel* v. *Conselho Supremo etc.* (1936) 6 Cal.2d 182, 186 [57 P.2d 131].)

The judgments of nonsuit entered in appellant Edwards' third cause of action of her first amended complaint and in the second cause of action in the second amended complaint of appellant Glass are affirmed. The summary adjudications rendered by the trial court on March 27, 1978, are reversed and remanded for proceedings consistent with this opinion.

Kingsley, J., concurred.

FILES, P. J., Dissenting.—I would affirm the judgment in its entirety. The majority decision, requiring the insurer to pay benefits not promised or paid for or reasonably expected, simply disregards reality.

It is common knowledge that selling life insurance is a highly competitive business. A large number of companies offer a wide variety of policies at premium rates which reflect the insurer's perception of its risk. In the present case the insured bought an ordinary life policy, payable in the amount of $8,000, with an additional $8,000 payable for accidental death within 90 days after the accident. The policy is unambiguous in this respect. Unquestionably this policy must have been less expensive than a straight life policy which would pay $16,000 regardless of the cause of death. There is no reason to doubt that the decedent could have purchased $16,000 in straight life coverage had he chosen to pay for it.

It cannot be doubted that a time limitation is an important feature of the policy which the decedent purchased. It is well known that an accidental injury which is not itself fatal, may arguably have the long-term effect of shortening the person's life span by leaving the person less resistant to other life-threatening ailments. The present case arises from that kind of claim. The insured sustained an accidental injury to his spine and died of pneumonia more than two years later.

A $16,000 straight life policy would have given the beneficiaries the benefit which they now seek. But such a policy doubtless would have required a higher premium. The majority decision here simply awards a gift of coverage which the insured did not choose to buy.

Particularly inappropriate is the assertion of the majority opinion (without citation of authority) that the policy which the decedent purchased was "a classic example of a contract of adhesion." That term generally "signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." (*Neal* v. *State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781].)

The insurance policy in this case was, of course, a standardized contract drafted by the insurer, but it is questionable whether the insurer, in this competitive market, has "superior bargaining strength" over the insured. Regardless of that, it is fatuous to assume that the insured had no choice but to take or leave this particular policy. Only under the most unusual circumstances would the insured have been unable to purchase a policy which would have agreed to pay $16,000 for the death in this case.

The time limit in the policy here is neither harsh nor unreasonable, as a limitation upon the risk assumed by the insurer, having in mind that a broader coverage was available had the insured desired it.

The record in this case, of course, does not show how many different insurance policies the decedent considered before selecting the policy which is involved here. But it should not be necessary for the insurer to put on evidence to this effect whenever the beneficiaries ask a court to award them greater benefits than are provided in the policy selected by the deceased.

The application of the "process of nature" rule to disability insurance arose because of problems peculiar to that kind of insurance. (See *Frenzer* v. *Mutual Ben. H. & A. Assn.* (1938) 27 Cal.App.2d 406, 413 [81 P.2d 197].) That experience provides no analogy for the life insurance field, with its enormous variety of benefits, coverages and premium rates. Other jurisdictions have agreed that a policy covering

accidental death occurring within a limited period of time is a perfectly legitimate kind of insurance which does not require judicial augmentation. (See Annot. (1971) 39 A.L.R.3d 1311, 1313, 1320.)