[No. D006516. Fourth Dist., Div. One. May 13, 1988.]

RICHARD ELLIS, Plaintiff and Appellant, v.
CHEVRON, U. S. A., INC., Defendant and Respondent.

**COUNSEL**

James H. Harmon, Byrd, Sturdevant, Harmon & Pace, Lawrence Teplin, Kenneth B. Bley and Cox, Castle & Nicholson for Plaintiff and Appellant.

Horton, Knox, Carter & Foote and Orlando B. Foote for Defendant and Respondent.

OPINION

BENKE, J.—

FACTS

On February 1, 1966, appellant Richard Ellis leased a 16,250 square-foot parcel of land he owned in Calexico, California, to respondent Chevron, U. S. A., Inc.'s (Chevron) predecessor in interest Standard Oil Company of California (Standard). The lease was on a printed form supplied by Standard. The initial term was for 10 years. In addition the lessee was given the option to extend the lease for two additional five-year periods. Standard and Chevron thereafter operated a gasoline station on the leased premises.

The parties' dispute is over paragraph 7 of the form. With respect to the period after termination of any extension, paragraph 7 gives the lessee the right to lease the property on the same terms set forth in any acceptable bona fide offer Ellis received from a third party. Paragraph 7 required Ellis to provide the lessee with a copy of any third-party offer he planned to accept and 60 days in which to lease the property on the terms set forth in the offer "or at such lesser terms as Lessor and Lessee may agree upon."[1]

In 1976 and again in 1981 Chevron exercised its five-year options. In 1985 Chevron offered to renew its lease of the 16,250 square feet for five more years with an additional five-year option. Chevron offered to pay an average of $2,888 a month over the first five years and $3,300 plus a maximum four percent cost-of-living adjustment during the second five years. Ellis did not accept Chevron's proposal.

---

[1] Paragraph 7 provides: "Lessee, while in possession, shall have the prior right (1) to buy the whole or any part of the leased premises or any larger parcel which includes the leased premises, if Lessor receives from a third party an acceptable bona fide offer to buy, or if Lessor offers to sell, such property, and (2) to lease the whole or any part of the leased premises or any larger parcel which includes the leased premises, if Lessor receives from a third party an acceptable, bona fide offer, or if Lessor offers, to lease such property for a term commencing on or after the expiration of the term hereof or any extension thereof. In either such event, Lessor shall forthwith give Lessee written notice of such offer, together with a copy thereof, and Lessee shall have sixty (60) days from the receipt of such notice to buy or to lease such property, as the case may be, at the terms of such offer, or at such lesser terms as Lessor and Lessee may agree upon. If Lessee fails to exercise such option within such sixty (60) days, Lessor shall have sixty (60) days thereafter within which to sell or to lease, as the case may be, such property to the party and upon the terms stated in the notice to Lessee without resubmitting such offer to Lessee as hereinabove provided. If Lessor sells such property to a third person, such sale shall be made subject to the terms and provisions of this lease, including, but without limiting the generality of the foregoing, the provisions of this paragraph. The rights of Lessee under this paragraph may be exercised by any nominee Lessee may designate, whose financial responsibility Lessee hereby guarantees."

By 1986 Ellis had obtained 9,750 square feet adjoining the station. In the spring of 1986, Pep Boys Manny, Moe and Jack of California (Pep Boys) offered to lease both of Ellis's parcels. Pep Boys offered to pay $3,000 a month plus a cost-of-living adjustment, to acquire 40,000 square feet of property adjacent to Ellis's parcels, to construct an auto parts store on the site and to enter a buy-sell agreement with respect to both parcels. Pep Boys proposed a 10-year term with four 10-year options. Pep Boys's offer was contingent on its ability to acquire the adjacent land.

On May 20, 1986, Ellis's counsel sent Chevron a copy of Pep Boys's offer and notice that Ellis planned to accept the offer unless Chevron agreed to its terms within 60 days.

On July 18, 1986, Chevron sent Ellis a letter which stated that Chevron accepted the rental price and potential 50-year term set forth in Pep Boys's offer; the letter states that since Chevron already had improvements on the site, the improvements set forth in Pep Boys's proposal were not applicable to it. With respect to the acquisition of the adjacent 40,000 square feet and Ellis's option to buy it, the letter states that Chevron would not be acquiring the parcel and would be "waiving this contingency."

On July 24, 1986, Ellis's counsel responded to Chevron's letter. He stated that he interpreted Chevron's letter as an acceptance of the provisions of Pep Boys's offer, including the obligation to construct a new building and acquire the adjacent property. Ellis's counsel asked Chevron to execute a lease in the form set forth in Pep Boys's offer by August 1, 1986. Chevron refused.

PROCEEDINGS BELOW

On August 29, 1986, Ellis filed a declaratory relief action against Chevron in which he sought a declaration that Chevron had not exercised its rights under paragraph 7 of the original lease. Pep Boys filed a complaint in intervention on September 12, 1986, asking for much the same relief.

On October 29, 1986, Chevron answered the Ellis and Pep Boys complaints and filed a verified cross-complaint against Ellis. The cross-complaint asked for a declaration determining that Chevron had exercised its rights under paragraph 7 and that it was entitled to lease the property under the terms set forth in Pep Boys's offer, save any requirement that it obtain the additional 40,000 square feet and construct an auto parts store on the site. In particular, according to its cross-complaint, Chevron had the right to "waive the contingencies set forth in said Paragraph 2 [of Pep Boys's

offer], including: ' . . . without limitation of the foregoing, the following: (i) The closing of the sale to Tenant of the property adjacent to the Premises . . . .' "

On October 31, 1986, when the term of the prior lease expired, Chevron held over. On November 5, 1986, Ellis filed an unlawful detainer action.

The declaratory relief action and the unlawful detainer action were consolidated for trial. The case was tried by the court without a jury. The trial court found in favor of Chevron and declared that Chevron was the lessee under a lease which did not require it to acquire the adjacent property or build an auto parts store.

## ISSUE ON APPEAL

Ellis argues on appeal that Chevron's response to Pep Boys's offer, because it did not include acquisition of the adjacent 40,000 square feet, did not give it the right to maintain its tenancy. We agree.

## SUMMARY

Under the lease proposed by Pep Boys, the lessee would provide Ellis with the following consideration: (1) rent starting at $3,000 a month and adjusted periodically for inflation; (2) a new commercial building on the premises; and (3) the right to purchase, at the end of the lease term, the 40,000 square feet of land adjacent to Ellis's parcels. Chevron has not suggested, either at trial or on appeal, that any of these items lack commercial value. Nonetheless Chevron argues that because acquisition of the additional land is not consistent with continued use of the premises as a gas station, it was excused from providing Ellis with that item of consideration. Although the express terms of Chevron's lease do not limit the type of offers Ellis may solicit, Chevron believes that under the covenant of good faith and fair dealing such a limitation may be implied.

We reject Chevron's argument. The only restriction which may be implied from the contract is that Ellis solicit commercially reasonable proposals.

## DISCUSSION

### I

#### *Contract Interpretation*

By its terms, paragraph 7 allows Ellis to exploit the value of his land by seeking lease proposals from third parties while nonetheless reserving for

the lessee the opportunity to continue its business. In this case these interests are in clear conflict: Ellis believes his commercial interest would be better served if his land were part of a larger commercial parcel; Chevron, on the other hand, believes it would do better maintaining the status quo. Unfortunately the express terms of paragraph 7 do not assist us in determining which of these competing interests prevails when they are in conflict. Thus, despite Chevron's position at oral argument, we are confronted with what is fundamentally a matter of contract interpretation.

■ In interpreting paragraph seven, we first note that neither party offered any extrinsic evidence with respect to the meaning of the lease. Thus, on appeal interpretation of the lease presents a question of law. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) ■ Secondly we note that, unlike the situation in *Mitchell* v. *Exhibition Foods, Inc.* (1986) 184 Cal.App.3d 1033 [229 Cal.Rptr. 535], paragraph 7 of the lease is on the printed portion of a form prepared by Standard, Chevron's predecessor in interest. Thus, under familiar principles of contract interpretation, any ambiguities and uncertainties in paragraph 7 will be construed against Chevron. (Civ. Code, § 1654; *Taylor* v. *J. B. Hill Co.* (1948) 31 Cal.2d 373, 374 [189 P.2d 258]; *Heston* v. *Farmers Ins. Group* (1984) 160 Cal.App.3d 402, 415 [206 Cal.Rptr. 585]; *Jacobs* v. *Freeman* (1980) 104 Cal.App.3d 177, 189 [163 Cal.Rptr. 680].)

■ Given the nature of leases in general, the length of this lease and Standard's role in drafting it, it appears paragraph 7 was intended to give more protection to Ellis's interest than that of Chevron. We find it difficult to believe a lessor of land would suspend indefinitely his ability to realize appreciation in land values. Such a disinterest in long-term appreciation is more consistent with the outright sale of land than the lease executed by the parties here. Thus the nature of the contract itself tends to rebut Chevron's claim that under paragraph 7, Ellis's interest in realizing the full value of his land is subordinate to its interest in operating a gas station.

We also observe that during the 20-year term of Chevron's lease, Ellis had no right to entertain lease proposals from any third parties. Thus during the term of the lease, the contract drafted by Standard expressly subordinated Ellis's economic interest in obtaining a more lucrative tenant to Standard's interest in continuing its business. The express nature of this protection suggests that if the parties meant to continue such a subordination of Ellis's interest beyond termination of the lease, they would have done so explicitly.

Thus, as we interpret paragraph 7, Chevron's right to continue in business is predicated on its ability to provide Ellis with whatever commercial

opportunity he is able to obtain in the marketplace. Cast in the negative, paragraph 7 cannot be interpreted as requiring Ellis to sacrifice his profits in order to protect Chevron's.

## II

### *The Covenant of Good Faith and Fair Dealing*

When confronted with problems of contract interpretation, some courts, in addition to the more common rules of construction, have looked to the covenant of good faith and fair dealing. (See, e.g., *Mitchell* v. *Exhibition Foods, Inc., supra,* 184 Cal.App.3d 1033, 1044; *April Enterprises, Inc.* v. *KTTV* (1983) 147 Cal.App.3d 805, 816 [195 Cal.Rptr. 421]; *Milstein* v. *Security Pac. Nat. Bank* (1972) 27 Cal.App.3d 482, 486-487 [103 Cal.Rptr. 16].) However, in this case, consideration of the covenant does not alter the conclusion we have reached.

█ Although the law implies in every contract a covenant of good faith and fair dealing, which requires neither party do anything which will deprive the other of the benefits of the agreement (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 768 [206 Cal.Rptr. 354, 686 P.2d 1158]), "[t]he precise nature and extent of the duty imposed . . . *will depend on the contractual purposes.*" (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141], italics added; accord *Betts* v. *Allstate Ins. Co.* (1984) 154 Cal.App.3d 688, 705 [201 Cal.Rptr. 528]; *National Life & Accident Ins. Co.* v. *Edwards* (1981) 119 Cal.App.3d 326, 339 [174 Cal.Rptr. 31].)

The importance of identifying the purpose of the parties' contract *before* considering the covenant as an aid in construction was highlighted in a line of cases which began with *Milstein* v. *Security Pac. Nat. Bank, supra,* 27 Cal.App.3d 482. In *Milstein* the beneficiary of a note and deed of trust sought the proceeds of a condemnation action in which a portion of the security was taken by a municipality. On appeal the court found the purpose of the note and deed of trust was to give the trustor use of the beneficiary's money for the period set forth in the note and to give the beneficiary a security interest in the trustor's property. (*Id.* at p. 487.) The court held: "To carry out that purpose, the implied covenant of good faith and fair dealing requires that appellant beneficiary exercise its discretion with respect to the condemnation fund in such fashion that it distribute to respondent borrowers all proceeds in excess of those necessary to recoup any impairment in security caused by the eminent domain proceeding. Since the trial court concluded on substantial evidence that appellant's security is

not impaired, respondents are entitled to all of the proceeds of the eminent domain action." (*Ibid.*)

*Milstein* was followed by *Schoolcraft* v. *Ross* (1978) 81 Cal.App.3d 75 [146 Cal.Rptr. 57]. In that case the secured property was a home which burned to the ground. The holder of a deed of trust refused to allow the homeowners to rebuild their house and insisted that the proceeds of their fire insurance policy be used to pay off the note she held. Relying on *Milstein* the court found the purpose of the note and deed of trust was to permit the borrowers to use the lender's money for the period specified in the note. (*Id.* at pp. 80-81.) Thus the court held the implied covenant prevented any accelerated payment from insurance proceeds unless the lender could show that her security had been impaired. (*Ibid.*)

In *Kreshak* v. *Sperling* (1984) 157 Cal.App.3d 279 [204 Cal.Rptr. 30], yet another trust deed holder attempted to accelerate payment on its note by demanding the entire amount paid on a fire insurance policy. Once again the court found that unless it was needed to protect the lender's security, such an acceleration was inconsistent with the purpose of borrowing and thus violated the covenant of good faith and fair dealing.

Finally in *Freeman* v. *Lind* (1986) 181 Cal.App.3d 791 [226 Cal.Rptr. 515], the court held that where a borrower breached its covenant to maintain fire insurance, the lender could accelerate payment on the note only if it could show that lack of insurance impaired its security. Again the court looked to the purpose of the note and deed of trust and held that the implied covenant prevented acceleration of the payment schedule set forth in the note unless some impairment of its security had occurred.

As we have seen in this case, the purpose of Chevron's lease, and paragraph 7 in particular, was to permit Ellis to exploit the value of his land after having given up that right for an extended period of time. Under the terms of the contract written by its predecessor in interest, Chevron's ability to continue its business beyond the term of the lease was made subordinate to that opportunity. Given this purpose the only duty which may be implied under the covenant is a duty on the part of Ellis to act in a commercially reasonable manner. (See *Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 496 [220 Cal.Rptr. 818, 709 P.2d 837].)

Chevron, however, relies upon *Mitchell* v. *Exhibition Foods, Inc., supra,* 184 Cal.App.3d 1033, 1043-1044, where the court declared that "[o]ne of the covenant's components which has been established in the field of commercial leases is a duty on the part of a landlord to promote the continued use and occupancy of the premises by an existing tenant."

Chevron urges this statement compels us to ignore what we believe was the purpose of the parties' contract and require Ellis to forego what he believes will be a profitable enterprise. We decline to do so.

Unlike the court in *Mitchell* we do not believe all commercial leases are necessarily burdened with an implied commitment to continue a tenant's business *after* expiration of the lease term. ■ ■■■ The cases cited by the *Mitchell* court certainly do not support such a broad proposition.[2] ■ More importantly, the nature of commercial leases counsels against imposing such an implied covenant. This case illustrates our concerns. Here, the lease containing paragraph 7 was executed in 1966. Since then redevelopment programs as well as other changes in regional economic circumstances have radically altered the value and use of large tracts of commercial real estate. (In preceding periods similar changes in our state have been brought about by an earthquake, the railroad and the goldrush.) It is the opportunity to exploit such dramatic change which the lessor retains by way of a lease as opposed to an outright sale. Thus we cannot

---

[2] In *Lippman* v. *Sears, Roebuck & Co.* (1955) 44 Cal.2d 136, 143 [280 P.2d 775], the court held: "Where the rental for use of a building is based upon a percentage of sales, the *lessee* reasonably may be said to covenant impliedly that he will use good faith to insure a continuation of them." (Italics added.) In *Cordonier* v. *Central Shopping Plaza Associates* (1978) 82 Cal.App.3d 991, 1000 [147 Cal.Rptr. 558], the operator of a restaurant franchise sued the owners of a shopping center after two of the center's major tenants vacated the premises. Under the terms of the restaurant's lease, the center promised to obtain 20-year leases from a supermarket, a department store and a drug store before the restaurant opened. The court held that from this covenant could be implied an ongoing responsibility to seek major tenants. "Under the rule of the *Lippman* case it appears that in appropriate circumstances a covenant of continuing use may be implied. By parity of logic a covenant may arise by implication to require the landlord to use good faith to insure continuing use and occupancy by major tenants for the 20-year term of the [restaurant's] master lease." (*Ibid.*) In *Edmond's of Fresno* v. *MacDonald Group, Ltd.* (1985) 171 Cal.App.3d 598 [217 Cal.Rptr. 375], a jeweler's lease contained a covenant that during the term of the lease the owner would not rent space in its shopping center to any other jeweler. Thereafter the owner expanded the shopping center and attempted to lease a portion of its new space to a plaintiff's competitor. In determining that the restrictive covenant applied to the lessor's additional space, the court relied upon the covenant of good faith and fair dealing. (*Id.* at pp. 605-608.) In our view these cases do not support the proposition that lessors must forego any opportunity to profit if that opportunity interferes with a tenant's business. Rather these cases like those following *Milstein* v. *Security Pac. Nat. Bank, supra,* 27 Cal.App.3d 482, require that we carefully consider the nature of the parties' agreement and its purposes. Indeed as the court in *Lippman* itself said: "The rules which govern implied covenants have been summarized as follows: '(1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract.'" (*Lippman, supra,* 44 Cal.2d at p. 142.)

accept the burden suggested by the court in *Mitchell* without changing the fundamental nature of the parties' contract.[3]

We agree, however, with *Mitchell* to the extent it would prohibit a contract condition by which a lessor could select an alternate use for his property which is inconsistent with the lessees' existing use yet holds no economic advantage for the lessor. Arguably the exercise of such a provision which serves only to oust a lessee could constitute a breach of the covenant of good faith and fair dealing. Such is not the case here. Pep Boys's proposal is clearly of economic advantage to Ellis. Moreover, an argument of bad faith on the part of Ellis might be more availing had Chevron made, and Ellis rejected, a proposal economically equivalent to that offered by Pep Boys. However, Chevron failed to avail itself of its contractually provided opportunity to negotiate with Ellis in order to extend to him an economic equivalent of Pep Boys's offer.

## CONCLUSION

Chevron concedes that it did not offer Ellis each item of consideration set forth in Pep Boys's proposal. Nor does Chevron argue that Pep Boys's offer was commercially unreasonable. Because we have found that Chevron was not otherwise excused from meeting the terms of Pep Boys's offer, its failure to do so entitles Ellis to possession of his property. Accordingly, the judgment appealed from is reversed with instructions that a judgment giving Ellis the right to possession of the premises, free from any claim by Chevron, be entered.

Kremer, P. J., and Scherer, J.,* concurred.

A petition for a rehearing was denied June 6, 1988, and respondent's petition for review by the Supreme Court was denied July 27, 1988.

---

[3] Unlike the court in *Mitchell,* we are not troubled by the prospect of a landlord establishing a sawmill where once stood a restaurant. (See *Mitchell* v. *Exhibition Foods, Inc., supra,* 184 Cal.App.3d at p. 1045.) This court sits in a city where 20-story office buildings, condominiums and shopping centers are rapidly taking the place of penny arcades and tattoo parlors. We do not believe that at the close of leases on such parcels, oppression necessarily results when landlords attempt to alter the prior use of their property.

* Assigned by the Chairperson of the Judicial Council.