[No. D014527. Fourth Dist., Div. One. Sept. 30, 1993.]

McMILLIN SCRIPPS NORTH PARTNERSHIP, Plaintiff and Appellant,
v.
ROYAL INSURANCE COMPANY OF AMERICA, Defendant and
Respondent.

## COUNSEL

Jennings, Engstrand & Henrickson, Gerald Smolin, Jr., Karen M. Stuckey, Sobel & Custer, Janet E. Sobel and Patricia Jo Custer for Plaintiff and Appellant.

Hill, Wynne, Troop & Meisinger, Kirk A. Pasich, Amy Kincaid Berry and Lori M. Yankelevits as Amici Curiae on behalf of Plaintiff and Appellant.

McCormick & Mitchell, John P. McCormick, David G. Axtmann, William R. Polk, William R. Baber, Cozen & O'Connor and Peter A. Lynch for Defendant and Respondent.

## OPINION

**BENKE, J.**—In this case the insured under a first party property insurance policy concedes it has not experienced any loss covered by the policy. Nonetheless, the insured argues the insurer should reimburse it for expenses it incurred in determining whether its losses were covered by the policy.

We find nothing on the face of the policy which provides for reimbursement of the investigation costs the insured is seeking. Accordingly, we affirm the summary judgment entered in favor of the insurer.

### FACTUAL AND PROCEDURAL BACKGROUND

#### 1. *1986 Leak*

Plaintiff and appellant McMillin Scripps North Partnership (McMillin) owns a parcel of land on Scripps Trail Drive in San Diego which it leases to the operators of a gasoline station and convenience store. On May 6, 1986, the lessees performed a precision test on the gasoline tank system and discovered a leak. The leak was repaired in September 1986 and thereafter the system passed all further precision tests.

#### 2. *1988 Policy*

On May 30, 1988, defendant and respondent Royal Insurance Company of America (Royal) issued McMillin a commercial property insurance policy which covered the year ending May 30, 1989. By way of a renewal McMillin extended the coverage through May 30, 1990. The policy covered losses at the Scripps Trail gasoline station and convenience store.

### 3. *1989 Claim*

On March 28, 1989, the County of San Diego sent McMillin a notice the county's investigation of gasoline odors in sewer pipes disclosed a leak had occurred at the Scripps Trail gasoline station. The notice required McMillin to determine the cause of the odors and remedy the problem.

McMillin retained the consulting firm of Ninyo and Moore to assist it in responding to the county's notice. In a report dated May 26, 1989, Ninyo and Moore advised McMillin the odors were probably caused by leakage from the gasoline storage tanks and that the leakage had probably occurred before the 1986 precision tests and repairs.

On October 26, 1989, McMillin gave Royal written notice of a potential loss under the policy due to the gasoline contamination identified by the county.

### 4. *Royal's Response*

On November 15, 1989, Royal advised McMillin it would investigate the claim but was reserving its right to dispute coverage. On January 8, 1990, McMillin provided Royal with reports prepared by Ninyo and Moore.

On January 10, 1990, McMillin submitted a proof of loss to Royal which Royal found defective. Later McMillin provided additional information to Royal, including the fact McMillin had incurred in excess of $150,000 in investigation costs.

### 5. *These Proceedings*

Because Royal had failed to determine whether McMillin's claim was covered under Royal's policy, on April 9, 1990, McMillin filed a complaint against Royal in which it alleged breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, negligent misrepresentation and a cause of action for declaratory relief.

Royal answered the complaint and alleged as an affirmative defense its contention no benefits were due McMillin under Royal's policy. On August 14, 1990, Royal moved for summary judgment. Royal argued there was undisputed evidence the contamination was caused by the leak discovered in 1986 and therefore no benefits were due under the policy. McMillin opposed the motion and objected to the form of Royal's motion and the admissibility of documents Royal submitted in support of the motion.

The trial court overruled McMillin's objections and granted Royal's motion. Following entry of judgment in Royal's favor, McMillin filed a timely notice of appeal.

## ISSUES ON APPEAL

On appeal McMillin frankly concedes that it has not experienced any loss covered by the Royal policy. Nonetheless McMillin contends Royal can still be held liable for breach of contract and breach of the covenant of good faith and fair dealing. We disagree and affirm.

### I

In arguing Royal can be held liable for breach of contract, McMillin contends that in addition to compensation for losses actually covered by the policy, Royal's policy also requires that Royal pay the costs McMillin incurred in determining whether its loss was covered by the policy. However, we have not found or been directed to any language in the policy which provides reimbursement of an insured's investigation costs when the investigation discloses no covered loss.

With respect to "Pollution Clean Up and Removal," the Royal policy provides "We will pay your expense to extract 'pollutants' from land or water at insured premises if the release, discharge or dispersal of the 'pollutants' is caused by or results from a *Covered* Cause of Loss that occurs during the policy period." (Italics added.) This language expressly limits Royal's liability to covered pollution losses. Having conceded no covered loss occurred, McMillin cannot assert any claim for breach of any express provision of the insurance contract.

Although courts are certainly free to find implied rights in contracts, those implied rights must be closely connected to the express provisions of the contract. (See *Ellis* v. *Chevron, U.S.A., Inc.* (1988) 201 Cal.App.3d 132, 141 [246 Cal.Rptr. 863].) In this regard it is important to distinguish between the limited scope of the coverage provided by first party property policies and the broad scope of third party liability policies from which many implied rights may be found. (See *Garvey* v. *State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 406 [257 Cal.Rptr. 292, 770 P.2d 704]; see also *Prudential-LMI Com. Insurance* v. *Superior Court* (1990) 51 Cal.3d 674, 697, fn. 8 [274 Cal.Rptr. 387, 798 P.2d 1230].)

Royal's first party property policy only promises to pay for enumerated casualty losses when such losses are incurred to property owned by McMillin. As our Supreme Court has noted " 'Property insurance, unlike liability insurance, is unconcerned with establishing negligence or otherwise assessing tort liability.' [Citation.]" (*Garvey* v. *State Farm Fire & Casualty Co., supra*, 48 Cal.3d at p. 406.)

The benefits provided by a liability policy are radically different. Significantly liability policies contain an express duty to defend. "An insurer's

duty to defend is a contractual duty arising from the express language of the policy." (1A Cal. Insurance Law & Practice (1993) § 13.08[1] p. 13-51.) "The language of liability policy typically includes language requiring an insurer to defend any suit against the insured regardless of whether the suit is groundless, false, or fraudulent." (*Ibid.*, fn. 1.) From the express duty to defend, the court in *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 267 [54 Cal.Rptr. 104, 419 P.2d 168], then implied a duty to provide a defense whenever the company's investigation discloses a *potentially* covered claim. In rejecting the insured's contention that the duty to defend should depend upon the outcome of the underlying claims, the court described the continuing nature of the protection expected under a liability policy: ". . . the insured would reasonably expect a defense by the insurer in all personal injury actions against him. If he is to be required to finance his own defense and then, only if successful, hold the insurer to its promise by means of a second suit for reimbursement, we defeat the basic reason for the purchase of the insurance. In purchasing his insurance the insured would reasonably expect that he would stand a better chance of vindication if supported by the resources and expertise of his insurer than if compelled to handle and finance the presentation of his case. He would, moreover, expect, to be able to avoid the time, uncertainty and capital outlay in finding and retaining an attorney of his own." (*Id.* at p. 278.)

■ The sharp differences between first and third party polices prevent us from creating any new implied right to payment for investigation costs in first party policies. Finding such a right in first party policies would be giving them a fundamental characteristic of liability policies: payment not only for covered casualties but payment for the costs of resolving a dispute. Nothing in the express terms of the Royal policy or the nature of first party policies in general warrants such an alteration of well-established and understood distinctions between property and liability coverage. (See, e.g., *Garvey* v. *State Farm Fire & Casualty Co.*, *supra* 48 Cal.3d at p. 406; *Prudential-LMI Com. Insurance* v. *Superior Court*, *supra*, 51 Cal.3d at p. 697, fn. 8.)

This is not to say, however, there is no duty to investigate in a first party setting. Indeed, Insurance Code section 790.03, subdivision (h)(3), requires prompt investigation of *all* insurance claims. However, like the court in *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 307 [250 Cal.Rptr. 116, 758 P.2d 58], we must recognize the difference "between the duty that the insurer owes . . . and the right to recover . . . for a breach of that duty." Following *Moradi-Shalal* v. *Fireman's Fund Ins. Companies*, although there are statutory duties, there are no private rights of action under Insurance Code section 790.03 subdivision (h). (See *Zephyr*

*Park* v. *Superior Court* (1989) 213 Cal.App.3d 833, 837-838 [262 Cal.Rptr. 106]; *Opsal* v. *United States Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1206, fn. 5 [10 Cal.Rptr.2d 352].)

II

McMillin also contends Royal breached the covenant of good faith and fair dealing by failing to fully and promptly investigate McMillin's claim. ▪▪ In light of McMillin's concession that no covered loss occurred, we believe this contention is governed by our holding in *Love* v. *Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1153 [271 Cal.Rptr. 246]: "Our conclusion that a bad faith claim cannot be maintained unless policy benefits are due is in accord with the policy in which the duty of good faith is rooted. The covenant of good faith and fair dealing is implied in law to assure that a contracting party 'refrain[s] from doing anything to injure the right of the other to receive the benefits of the agreement.' (*Egan* v. *Mutual of Omaha Ins. Co.* [1979] 24 Cal.3d [809,] 818 [169 Cal.Rptr. 691, 620 P.2d 141].) In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract. Thus, when benefits are due an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because it frustrates the insured's *primary* right to receive the benefits of his contract—i.e., prompt compensation for losses. Absent that primary right, however, the *auxiliary* implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings."

Like the court in *Love* v. *Fire Ins. Exchange*, we take pains to emphasize that where an insurance company fails to properly investigate and later coverage under a first party policy is established, the lack of proper investigation will certainly be relevant in establishing the company's bad faith. (See, e.g., *Opsal* v. *United States Auto. Assn., supra,* 2 Cal.App.4th at p. 1205: " '[T]he ultimate test of [bad faith] liability in the first party cases is whether the refusal to pay policy benefits was *unreasonable.*' ")

We also continue to believe that ". . . there may be unusual circumstances in which an insurance company could be liable to its insured for tortious bad faith despite the fact that the insurance contract did not provide for coverage." (*Murray* v. *State Farm Fire & Casualty Co.* (1990) 219 Cal.App.3d 58, 65-66 [268 Cal.Rptr. 33].) For instance, in *Rawlings* v. *Apodaca* (1986) 151 Ariz. 149 [726 P.2d 565], an insured was told by its

insurer that he did not have to obtain his own investigation of a substantial fire loss, only a portion of which was covered by a first party casualty policy. The insurer then conducted an investigation and paid the insured the $10,000 policy limits of the first party policy. Although it had promised to share the results of the investigation, the insurer refused. Later, by way of civil discovery, the insured obtained the investigator's report, which disclosed that the fire was caused by another policyholder of the insurer—one who had $100,000 in liability coverage.

In finding a breach of the covenant of good faith and fair dealing under these circumstances the Arizona Supreme Court stated: "In the case at bench the trial court found that Farmers intentionally pursued a course of conduct designed, for its own benefit, to impede the insureds' claim against the tortfeasor. Thus, although Farmers performed its express covenants, the evidence supports the conclusion that for its own profit Farmers breached its duty to play fairly with its insureds and to give their legitimate interests equal consideration. Those legitimate interests of the insureds arose out of the very event against which Farmers sold protection. The insureds would clearly have been better off without any insurance if by paying $10,000 the insurer could prevent the insureds' recovery of the larger portion of the loss." (*Rawlings* v. *Apodaca, supra,* 726 P.2d at p. 573.)

Here of course, we have nothing which approaches the circumstances presented in *Rawlings* v. *Apodaca.* We have no misrepresentation by Royal which hindered McMillin's own investigation or conduct by Royal which otherwise prevented McMillin from protecting its interests in the insured property. Rather, because there was no breach of the express provisions of the contract or other interference with the interests the policy was designed to protect, no claim for breach of the covenant arises.

### III

Finally, McMillin argues the trial court erred in overruling its objections to the form of Royal's motion and the admissibility of a declaration Royal submitted in support of the motion.[1] In light of McMillin's concession it did not suffer a covered loss and our conclusion that, therefore, McMillin has no claim for breach of contract or breach of the implied covenant, these contentions are now moot. Any defect in the form of the motion or the authentication have been completely remedied by McMillin's concession.

---

[1] McMillin contends Royal's motion was defective because it did not conform with the requirement of San Diego County Superior Court local rule 4.3(f)(2) which provides: "All separate statements in support of motions for summary adjudication of issues shall specify the matter/issue to which each contended undisputed fact relates."

McMillin contends the declaration did not properly authenticate the documents which Royal relied on in establishing the date of the 1986 leak.

Judgment affirmed.

Nares, J., concurred.

**WIENER, Acting P. J.,** Dissenting.—In 1988 Royal issued McMillin a commercial property insurance policy which, among other things, provided coverage for damage caused by the discharge of pollutants if the discharge resulted from any of a varied list of specific factors including fire, vandalism, falling objects or water damage. McMillin does not dispute that the reports furnished to Royal established that the leak which caused the contamination occurred in or before 1986. Instead it argues that no fuel spillage was detected in 1986 and the loss only manifested itself in 1988 when odors were first noticed.[1] (See generally *Prudential-LMI Com. Insurance* v. *Superior Court* (1990) 51 Cal.3d 674 [274 Cal.Rptr. 387, 798 P.2d 1230].) It correctly asserts that as of January 1990, the exact cause of the leak had not been established and that Royal's investigation had not reasonably ruled out the possibility of a covered loss. (See generally *Garvey* v. *State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 406 [257 Cal.Rptr. 292, 770 P.2d 704] [burden is on the insurer to prove a claim is excluded].)

In the context of the foregoing, the majority acknowledge that an insurer has a statutory obligation to investigate an insured's claim where the facts suggest a reasonable possibility of coverage under the policy. This obligation, however, is ephemeral in light of the majority's conclusion. They hold that even where an insurer ignores this obligation, it will not be liable for its failure unless the investigation the insured is forced to conduct on its own ultimately demonstrates a covered loss. The result is a rule which will allow insurance companies to deny insureds the financial and emotional security they reasonably believe they are purchasing when they buy an insurance policy.

In deciding this issue of first impression, the majority conclude a duty on the part of an insurer to investigate a potential claim cannot be implied from the language of this policy and should not be implied generally as a matter of law. They are incorrect on both counts.

## A

The majority say there is no "language in the policy which provides reimbursement of an insured's investigation costs when the investigation

---

[1] Contrary to Royal's assertion, the trial court did not expressly base the grant of summary judgment on a conclusion that the loss was manifested before the Royal policy period. Indeed, McMillin conceded a lack of coverage and the specific reason was irrelevant in view of the court's conclusion that a reasonable investigation had been done and no additional investigation would have revealed any possibility of coverage.

discloses no covered loss." (Maj. opn., *ante*, p. 1220.) They are accurate in this limited statement. Indeed, there is no language which provides for reimbursement where the investigation discloses a *covered* loss, although the majority concede reimbursement is required in such circumstances. The reason for the omission is clear. Because the policy assumes the insurer will comply with its contractual obligations, reference to the insurer's obligation to reimburse the insured for investigation costs would be surplussage.

The policy in this case reasonably implies that Royal will conduct a reasonable investigation to determine whether there is coverage. The policy requires the insured to give "prompt notice" of the loss to Royal, to describe "how, when and where" the loss occurred, and to allow Royal "to inspect the property and records proving the loss or damage." Beyond that the insured is expressly directed to "cooperate" with Royal "in the *investigation* or settlement of the claim." (Italics added.) I see no way of reading these provisions other than to imply an obligation to reasonably investigate a potential claim. (See, e.g., *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545] [insurance policy must be interpreted consistent with the objectively reasonable expectations of the insured]; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 270 [54 Cal.Rptr. 104, 419 P.2d 168].) And since the principal purpose of the investigation is to determine whether there is a covered loss, it would be objectively unreasonable to interpret the duty to investigate as being contingent on whether there is coverage.

B

Having found no contractual duty as a matter of fact, the majority then reject any suggestion that a duty to investigate should be implied as a matter of law, accepting Royal's argument that it is obligated to pay the costs of investigation only if the investigation ultimately shows a covered loss. McMillin responds that the duty to investigate in first party policies should be analogized to the duty to defend in third party policies as analyzed in *Gray* v. *Zurich Insurance Co., supra*, 65 Cal.2d 263. The insurer in *Gray* argued it had an obligation to defend the insured only if the third party lawsuit ultimately established coverage under the policy. Justice Tobriner's now-landmark opinion rejected this contention, explaining that an insured "would reasonably expect a defense by the insurer in all personal injury actions against him. If he is to be required to finance his own defense and then, only if successful, hold the insurer to its promise by means of a second suit for reimbursement, we defeat the basic reason for the purchase of the insurance. In purchasing his insurance the insured would reasonably expect that he would stand a better chance of vindication if supported by the resources and expertise of his insurer than if compelled to handle and

finance the presentation of his case. He would, moreover, expect to be able to avoid the time, uncertainty and capital outlay in finding and retaining an attorney of his own." (*Id.* at p. 278.)

Although they acknowledge the superficial similarity between the duty to defend in third party policies and a duty to investigate in first party policies, the majority assert that conceptual differences between first and third party policies argue against implying an investigative duty for insurers. The majority's analysis does not withstand scrutiny.

It is true that differences between first and third party coverage have resulted in different rules of policy interpretation. In first party policies, a bilateral contractual relationship between insurer and insured is at issue. In third party policies, the direct beneficiary of the contract is an unrelated third party who has been injured. Thus in *Garvey* v. *State Farm Fire & Casualty Co.*, *supra*, 48 Cal.3d 395, the considerations supporting the broad coverage rules of concurrent causation applicable to third party policies (see *State Farm Mut. Auto. Ins. Co.* v. *Partridge* (1973) 10 Cal.3d 94 [109 Cal.Rptr. 811, 514 P.2d 123]) did not compel a similar approach for first party policies.

But *Garvey*'s interpretive dichotomy applies to *coverage* questions. (See, e.g., *Chu* v. *Canadian Indemnity Co.* (1990) 224 Cal.App.3d 86, 94 [274 Cal.Rptr. 20] ["The *Garvey* court recognized that coverage questions must be analyzed differently, depending on which type of coverage the insured invokes."].) Coverage for a loss specified in the policy is not the issue in this case. Rather, we are asked to decide the preliminary question whether the insurer is obligated to pay for the costs of an investigation reasonably necessary to determine whether coverage exists. *Garvey* explains that interpretive rules in third party policies may be different because the purpose of the policy is to indemnify the insured for tort liability to a third party. (48 Cal.3d at pp. 406-407.) But the broad duty to defend independent of ultimate coverage which was recognized in *Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d 263 does not inure to the benefit of the third party.[2] It directly and exclusively benefits the insured. Thus the considerations identified in *Garvey* simply do not justify any distinction in the interpretation of policy provisions which directly benefit the insured. (Cf. *Fireman's Fund Ins. Co.* v. *Aetna Casualty & Surety Co.* (1990) 223 Cal.App.3d 1621, 1628 [273 Cal.Rptr. 431] ["*Garvey* neither holds nor suggests that *all* legal principles developed in first party cases are inapplicable in third party cases."].)

Moreover, the same practical considerations which led the Supreme Court in *Gray* to recognize a duty to defend irrespective of ultimate coverage impel

---

[2]Indeed, recognition of a duty to defend on the part of the insurer probably makes it less likely that the third party plaintiff will recover from the insured.

even more strongly the recognition of an implied contractual duty to investigate in first party cases. By refusing to do so, the majority create an unnecessary tension between the statutory duty to investigate recognized in Insurance Code section 790.03, subdivision (h)(3), and the insured's rights under the insurance policy. Nothwithstanding this tension, responsible insurers committed to performing in an ethical manner will continue to investigate a claim if there is a reasonable possibility of coverage under the policy. But if a less committed insurer refuses to investigate or performs an inadequate investigation, many insureds will not have the resources to complete an investigation on their own. Without an investigation, coverage cannot be established. Thus, where a legitimate question as to coverage exists, the insured is of limited means and the necessary investigation involves significant expense, the majority's rule provides an economic incentive for insurers to forgo the investigation, deny coverage, and incur the minimal risk that the insured can later establish coverage and sue for reimbursement. And even in those cases in which insureds are able to pursue their rights against recalcitrant insurers, I see little benefit to the public or the judicial system by a rule which encourages another unnecessary round of litigation seeking extracontractual and punitive damages.

Courts do more than decide discrete cases affecting the interests of the parties to a particular lawsuit. In the insurance area in particular, we must recognize that our decisions affect the ways companies draft policies, structure their procedures, and interact with their insureds. In deciding cases we have an obligation to create rules which clarify the obligations of insurers and insureds fairly and reasonably. Unfortunately, the majority's discussion confuses rather than clarifies the obligations of insurers under California law, creating a significant potential for abuse of California's insurance consumers.

A petition for a rehearing was denied November 1, 1993, and appellant's petition for review by the Supreme Court was denied February 3, 1994. Kennard, J., and Arabian J., were of the opinion that the petition should be granted.