[No. D010413. Fourth Dist., Div. One. Sept. 18, 1990.]

HILBERT CHU et al., Plaintiffs and Appellants, v.
CANADIAN INDEMNITY COMPANY, Defendant and Respondent.

COUNSEL

Churchill & Kaplan, Gordon S. Churchill and Suuzen Ty Anderson for Plaintiffs and Appellants.

Simon, Buckner & Haile, Stuart L. Brody and Alan G. Buckner for Defendant and Respondent.

OPINION

**FROEHLICH, J.**—Appellants Hilbert Chu and KCOO Development Co., Inc. (collectively Chu) appeal from the judgment entered in favor of respondent Canadian Indemnity Company (Insurer) following an order granting Insurer's motion for summary judgment. Chu contends the trial court erred in concluding that all of the damages for which Chu's lawsuit sought

coverage were merely further manifestations of the same defective condition already known to Chu before Insurer's policy became effective. Because we conclude there are triable issues of material fact, we reverse the judgment.

## I. Factual Background

Certain facts are undisputed. In late 1981, construction on a 26-unit condominium project was completed. KCOO was the developer of the project but did not participate in any of the actual construction. Hilbert Chu was the sole shareholder and president of KCOO.

On March 1, 1982, after completion of the project, Insurer issued a so-called "multi-peril policy" (the policy) to the project's homeowners association. This policy provided both first party property coverage and third party liability coverage, and covered both KCOO and Chu as additional insureds. The policy remained in effect until July 1984. The claims in dispute pertain to coverage of Chu for third party claims brought by homeowners against Chu for construction defects.

### A. Initial Problems

Almost immediately upon completion of the project, and before Insurer issued the policy, problems began surfacing. In January and February 1982, cracking and uplifting in the pool area and driveway were found, apparently because cracks or improperly sealed joints allowed moisture to infiltrate the underlying expansive subgrade soils. The soils engineer's investigation indicated that although normal precautions (such as saturation of the underlying subgrade soils and placement of a layer of sand prior to pouring the concrete) were purportedly taken, "greater efforts in this regard," including adding "rebars" to the concrete pool decking, should have been made when repairs were performed. There is no claim that Insurer is responsible for these damages.

### B. The 1983 Lawsuit

The so-called "second set" of problems, for which Chu also concedes Insurer is not responsible, is nevertheless at the heart of the facts giving rise to the current dispute. Sometime prior to June 1983, a more extensive set of defects surfaced, leading Chu to sue numerous parties (including the architect, the civil engineers and the soils testing firm). The alleged problems primarily fell into five basic categories: poorly designed laundry facilities; problems in the heating and air-conditioning system; leaks in the unit balconies and windows; leaks in the interior plumbing; and cracks in the unit slabs.

Chu's 1983 lawsuit, filed before any units were sold to third parties, alleged the named defendants were aware of the expansive soil conditions of the site, but negligently designed or constructed buildings, foundations and structures which were improper or unsuitable for the existing soil conditions, causing the second set of problems.[1] The 1983 lawsuit further alleged that KCOO "discovered" the soils engineer's breach (i.e., the failure to include "special structural safeguards" in light of the expansive soil) in January 1982, apparently referring to the pool and driveway problems for which the lawsuit also sought to recover.

The 1983 lawsuit finally alleged that, as a result of the negligently prepared plans and specifications and improper construction methods and materials, the foundations and structures were unsuitable, rendering the units unsalable and unfit for habitation.

Despite the legal hyperbole of the 1983 lawsuit, the units were in fact sold and inhabited. Between August 1983 and February 1984 Chu sold ten units; in March and June 1984 an additional seven units were sold; and in August 1984 two more units were sold. It is Chu's liability to these purchasers which is the gravamen of the dispute between Chu and Insurer.

### C. Problems Surfacing After Sales[2]

A final set of problems subsequently emerged, although the precise date on which each problem became apparent is unclear. These included slope

---

[1] Chu's unverified 1983 complaint does not specify *what* was defective about the design or construction of the buildings or foundations, nor does it allege what would have been a "nondefective" mode of construction. Instead, the complaint (in the form fondly and commonly used by lawyers) alleges the entire gamut of errors and omissions in a conclusory fashion. Thus, for example, the architect's negligence is alleged in shotgun fashion, i.e., that it "designed, recommended and specified improper and unsuitable foundations and structures" for the existing soil conditions. The complaint is silent on whether the defect related to (1) thickness of the foundation slabs; (2) presence of sufficient (or any) rebar reinforcement in the slab; (3) grading and/or compaction solutions to the expansive soil problem; (4) insufficiently strong concrete materials; (5) insufficient footings; etc. Similarly, the soil testing firm's defaults are recited in shotgun fashion: It was allegedly negligent in (1) recommending a grading procedure; (2) designing or testing for the grading procedure; (3) designing a "suitable foundation"; and (4) inspecting or testing the soil and groundwater condition. Again, the conclusory nature of the allegations (i.e., that the foundation was "unsuitable" in "design or construction") render it difficult to discern what Chu knew or believed was defective about the foundation.

We linger at length over these minutiae because Insurer's argument against coverage is founded on the 1983 lawsuit. As we discuss below, this foundation for Insurer's argument appears as equally unsuited to the summary judgment edifice Insurer constructs as was the foundation for the project.

[2] We refer to the third set of problems as having "surfaced after sales" to the third parties solely for ease of reference. We recognize, of course, that Insurer contends the defects had already "manifested" themselves before any sales were completed. We further recognize that

and water drainage problems; decaying stucco; problems with the tile roofing; problems with the exterior plumbing; beetle infestations in kitchen areas; etc. The most critical problem, according to Chu, was that the building footings were inadequately designed and/or constructed, given the expansiveness of the soil, to support the structure's weight load. The City of Los Angeles reviewed the foundation problems and concluded, in a report issued December of 1984, that the structural distress being experienced was caused by inadequate design of the footings and foundations, poor grading and construction techniques, failure to follow plan requirements, and the apparent ad hoc addition of shallow "shovel footings" instead of stronger footings, as well as the concurrent failure of the building inspector to detect changes or omissions from required construction elements. All but two of the units were ultimately condemned by the City of Los Angeles.

### D. Settlement with Unit Purchasers

In November 1984, as part of the settlement discussions aimed at resolving the 1983 lawsuit, the settlement judge suggested that the unit purchasers be brought into the settlement negotiations, in the apparent hope of fashioning a global settlement. In March 1985, Chu tendered the defense of the third party claims to Insurer, but Insurer neither admitted nor denied coverage for Chu's claims.

A settlement with 18 of the 19 unit purchasers was reached in May 1985.[3] In July 1985, the 19th purchaser filed suit against Chu for personal injuries and property damage, the defense of which was also tendered to Insurer, but was apparently neither accepted nor rejected by Insurer. The last lawsuit was settled for $240,000, without contribution from Insurer.

### II. The Current Lawsuit

Chu filed a complaint against Insurer[4] containing the causes of action customarily alleged by aggrieved insureds against their insurers for refusing

---

some of the third set of defects apparently were known to Chu "midstream," i.e., after some units were sold but before other units were sold. For example, 10 units were sold through February 1984; in March 1984 a report was prepared for Chu outlining grading and construction problems related to drainage deficiencies; thereafter, between March and August 1984, 9 more units were sold. Our reference to these defects as having emerged "post-sale" is solely for purposes of organizational simplicity.

[3] The settlement essentially involved the payment of funds to the unit purchasers, who in turn reconveyed their units (subject to existing mortgages) to Chu. Chu also obtained an assignment of whatever rights the unit purchasers may have had against any insurance policies covering the project. Chu paid $320,000 of the $680,000 cash payable to the unit purchasers, with the balance paid by various other parties, including a $60,000 contribution by Insurer.

[4] Chu's complaint also alleged claims against another insurance company, which was "on-risk" prior to the inception of Insurer's policy. However, Chu subsequently dismissed the

to pay or defend against claims the insured had asserted were covered. Chu moved for summary adjudication of certain issues, to wit, that Insurer was obligated (under the liability portion of the policy) to defend and indemnify Chu against lawsuits for bodily injury and property damages which "occurred" during the policy period. Insurer cross-moved for summary judgment or summary adjudication of certain issues, essentially seeking a declaration that it had no defense or indemnity obligations.

Insurer's principal argument was that the damage which formed the basis of the third party claims against Chu (and hence the liability against which Chu sought indemnity) was nothing more than a continuation of the same damage manifested *before* Insurer's policy became effective. Because this was merely a "loss in progress," Insurer argued, there was no fortuitous "occurrence" during the policy period, but merely a "reoccurrence" of the same loss previously manifested. Chu's opposition to Insurer's motion essentially contended there were triable issues of fact as to whether the initial set of problems discovered and known to Chu since 1982 constituted the *same* defect which caused the damage for which Chu currently sought coverage, and whether Chu's sale of units to third parties without investigating the structural integrity of the project could be a negligent act for which third party liability coverage existed.

The trial court granted summary judgment in favor of Insurer, reasoning that the construction defects (i.e., the initial set of subsidence problems) were first evidenced in 1982 and that all subsequent problems (including those upon which third party liability coverage was premised) were nothing more than a reoccurrence or further manifestation of the same defect— "faulty construction." After judgment was entered, Chu appealed.

### III. *General Principles*

Chu contends third party coverage exists because their liability to third parties is based on an "occurrence" (i.e., the sale of the units) which caused damage neither expected nor intended by Chu, the damages having arisen from defects *unknown to Chu at the time the units were sold*. Insurer argues no coverage exists because Chu's liability to the third parties did not arise from any "accident," but instead from Chu's intentional selling of units suffering from construction defects known to Chu, which units Chu knew to be uninhabitable and unsalable.

Because of the complexity of the legal framework governing this case, we preface our analysis with a review of pertinent concepts.

other insurance company with prejudice, leaving only Chu and Insurer as parties to the instant dispute.

### A. *Distinction Between First Party and Third Party Coverage*

The policy which Insurer issued to Chu contains both first party property and third party liability coverages. These coverages differ in their fo- When an insured seeks indemnification for loss incurred through damage to the insured's own property, he relies on first party coverage. When an insured seeks protection or indemnification for his liability to another, he relies on third party coverage. (*Garvey* v. *State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 399, fn. 2 [257 Cal.Rptr. 292, 770 P.2d 704].)

The *Garvey* court recognized that coverage questions must be analyzed differently, depending on which type of coverage the insured in- First party property coverage generally turns upon whether the loss is a " ' . . . covered loss. Coverage, in turn, is commonly provided by reference to causation, e.g., "loss caused by . . ." certain enumerated perils. [¶] The term "perils" in traditional property insurance parlance refers to fortuitous active physical forces such as lightning, wind, and explosion, which bring about the loss.' " (48 Cal.3d at p. 406.) Thus, first party coverage initially focuses on whether the loss was caused by an included or excluded fortuitous peril.

 Third party coverage, on the other hand, " . . . draws on traditional tort concepts of fault, proximate cause and duty. This liability analysis differs substantially from the coverage analysis in the [first party] property insurance context, which draws on the relationship between perils that are either covered or excluded in the contract. In [third party] liability insurance, by insuring for personal liability, and agreeing to cover the insured for his own negligence, the insurer agrees to cover the insured for a broader spectrum of risks . . . . [¶] . . . [Under a] first party property policy . . . the exclusions become the limitation on loss coverage. Under the liability portion of the policy, on the other hand, the focus is, at least initially, on the insured's legal obligation to pay for injury or damage arising out of an 'occurrence.' " (48 Cal.3d at pp. 407-408.)

 Thus, when an insured seeks coverage for his own loss, the initial question is whether the loss was caused by a fortuitous event which is an included peril. When he seeks protection against liability to third parties, the initial question is whether his liability arose out of an "occurrence" or "accident."

### B. *Fortuitous Event: "Manifestation" and "Accident"*

 The concept of "fortuity" is basic to insurance law. Insurance typically is designed to protect contingent or unknown risks of harm (Ins. Code,

§§ 22, 250), not to protect against harm which is certain or expected. (See, e.g., *Hogan* v. *Midland National Ins. Co.* (1970) 3 Cal.3d 553, 559-561 [91 Cal.Rptr. 153, 476 P.2d 825].) Insurance protects against risks of loss, not certainties of loss.

In first party property insurance, "manifestation" of the damage caused by a covered peril triggers the insurer's obligation to pay for the loss, because the "fortuity" (i.e., the covered risk of peril) has occurred, resulting in damage which became apparent while the policy was in effect. (*Home Ins. Co.* v. *Landmark Ins. Co.* (1988) 205 Cal.App.3d 1388, 1392-1393 [253 Cal.Rptr. 277] [as between two insurers, the insurer "on-risk" at the time damage was first manifest is liable for entire loss].) After "manifestation" of the covered loss, only the *extent* of damage is uncertain: " 'Once the contingent event insured against has occurred during the period covered, the liability of the carrier becomes *contractual* rather than *potential* only, and the sole issue remaining is the extent of its obligation.' " (*Ibid.*)

In third party liability cases, an analogous concept of "occurrence" or "accident" has emerged. The insurer's obligation to pay is ordinarily triggered when the insured is liable to a third party for injuries or damages caused by an "occurrence" or "accident," and the time of the "occurrence" is "not the time the wrongful act was committed, but the time when the complaining party was actually damaged." (*Remmer* v. *Glens Falls Indem. Co.* (1956) 140 Cal.App.2d 84, 88 [295 P.2d 19, 57 A.L.R.2d 1379]; see also *Employers Casualty Co.* v. *Northwestern Nat. Ins. Group* (1980) 109 Cal.App.3d 462, 468-469 [167 Cal.Rptr. 296].) Thus, once the fortuity (i.e., the "occurrence" or "accident") has happened and the third party has been injured by the insured's conduct, liability coverage becomes implicated.

C. *Absence of Fortuity or Accident*

■ The "fortuity" and "accident" concepts have an opposite corollary: First party insurance does not protect against losses which are certain to occur (*Home Ins. Co.* v. *Landmark Ins. Co., supra*, 205 Cal.App.3d 1388), and third party liability insurance does not protect against nonaccidental harm inflicted by the insured. (*Commercial Union Ins. Co.* v. *Superior Court* (1987) 196 Cal.App.3d 1205, 1207-1209 [242 Cal.Rptr. 454].)

In *Home Ins. Co.* v. *Landmark Ins. Co., supra*, 205 Cal.App.3d 1388, a first party property insurance case, this court was required to determine which of two insurers was liable for losses sustained from progressive deterioration of property caused by a defective condition of the property. Was the insurer whose policy was in effect when the damage first manifested liable for the entire amount, or was a subsequent insurer (who issued a subsequent

policy which was in effect while the problem worsened) liable for that portion of the loss which occurred during its tenure? This court held that the insurer "on-risk" at the time damage was *first* manifest is liable for the *entire* loss, reasoning that once the loss becomes manifest, the contingency insured against has occurred and only the extent of the loss awaits determination. When there is a "loss in progress," subsequent insurers are not responsible, because the loss is no longer based on a risk or contingency (i.e., a "fortuity") against which the insurance protects but is instead a certainty. (*Id*. at pp. 1393-1395.)

Analogous considerations operate in the arena of third party liability insurance. When the injury is an unexpected or unintended consequence of the insured's conduct, it may be characterized as an accident for which coverage exists, but when the injury suffered is expected or intended, coverage is denied because there is no "accident." For example, in *Hogan* v. *Midland National Ins. Co., supra*, 3 Cal.3d 553 the insured sold a defective saw which cut the lumber more narrowly than it should have. Some wood was processed before the defect was discovered rendering it too narrow, but after discovery of the defect the purchaser purposefully cut wider lumber to compensate for the defect. The *Hogan* court held that damage from the "too-narrow" wood was an unexpected and unforeseen injury as a result of the defect and hence was a covered "accident," but that intentionally cutting "over-wide" wood was not an "accident" because the insured contemplated and expected such "over-wide" wood would result from his acts. (See also *Economy Lumber Co.* v. *Insurance Co. of North America* (1984) 157 Cal.App.3d 641, 647-648 [204 Cal.Rptr. 135] [homes damaged from application of defectively milled siding installed both before and after defect discovered; court held: damage for wood installed prediscovery is accidental, but postdiscovery injury was expected and not accidental].)

IV. *Third Party Liability Insurance Applies to the Extent Third Parties Suffer Damages Which Were Caused by Defects Unknown to Chu at the Time the Units Were Sold*

Chu argues they are entitled to third party liability coverage to the extent they sold units which were subject to defects unknown to them,[5] which

---

[5] Chu concedes third party liability insurance does not protect against liability claims to the extent such claims were based on either the initial set of defects (i.e., to the pool or driveway) or for the second set of defects referred to in the 1983 lawsuit, since Chu correctly recognizes that awareness of those defects precludes the unit purchaser's resulting damages from being "accidental" and that such damages were the expected or intended consequences of Chu's act of selling the units without disclosing such known defects. (See, e.g., *Royal Globe Ins. Co.* v. *Whitaker* (1986) 181 Cal.App.3d 532, 536-539 [226 Cal.Rptr. 435] [claim of fraud based on promise made without intent to perform not covered by liability insurance because injury results from intentional, not accidental, misconduct]; *Commercial Union Ins. Co.* v. *Superior*

defects thereafter manifested themselves causing injury to the unit purchasers. This contention correctly states applicable legal principles. (See, e.g., *Geddes & Smith, Inc.* v. *St. Paul Mercury Indemnity Co.* (1959) 51 Cal.2d 558, 563-565 [334 P.2d 881] [installation of doors, subject to unknown defect, which subsequently failed causing property damage to home purchasers, held an "accident" because door failures and resulting injury to purchasers not expected or foreseen].)

Insurer's argument does not dispute the general legal precept outlined in *Geddes*. Instead, Insurer contends Chu was in fact aware, before selling the units, that the units were suffering from defects, and that the postsale "damage" was an inevitable result of the known defects. Insurer relies on two components for proof of its contention of Chu's knowledge: (1) the 1982 expert reports provided to Chu which attributed the pool and driveway problems to expansive soil conditions; and (2) the 1983 lawsuit, which alleged the foundations were inadequately designed and constructed for the existing expansive soil conditions, causing the 1983 set of problems. The current set of problems, Insurer argues, is nothing more than a remanifestation of these previously known defects.

Our conclusion that there are triable issues of fact rests on two basic propositions. First, knowledge of one defect or set of defects is not the equivalent of knowledge of other, distinct defects in the same project. Second, to bar third party liability coverage, the defect causing the postsale damage must have been *known* to Chu or their agents before the units were sold; third party liability coverage is not barred merely because Chu "should have discovered" the defect but negligently failed to do so.

### A. *Knowledge of One Defect or Set of Defects Is Not the Equivalent of Knowledge of Other, Distinct Defects*

■ It is undisputed that Chu had knowledge of some construction defects before the units were sold. However, in granting Insurer's summary judgment motion, the trial court apparently concluded that the "defect" was "faulty construction." Once the defect manifested itself in 1982, the trial court reasoned, all of the subsequent problems (including those upon which third party liability coverage was premised) were nothing more than a reoccurrence or further manifestation of the same defect of "faulty construction."[6]

---

*Court, supra,* 196 Cal.App.3d at pp. 1208-1210 [no coverage for wrongful termination because gravamen of injury arose from intentional, not accidental, misconduct].)

[6] The trial judge, explaining the basis for his ruling, commented: ". . . [T]here doesn't appear to be any dispute that there was a notification of damage at a period of time prior to the inception of the Canadian Indemnity policy. [¶] . . . [T]he real gravamen of this is that in

However, knowledge that a project suffers from one defect does not equate with knowledge of other, distinct construction deficiencies. The court in *Winston Square Homeowner's Assn.* v. *Centex West, Inc.* (1989) 213 Cal.App.3d 282 [261 Cal.Rptr. 605] dealt with an analogous problem. In *Winston Square*, the homeowners association sued the developer for construction defects, alleging seven types of deficiencies, including drainage problems on the grounds, various structural problems with the units which allowed water to intrude into the units, and problems with balcony railings. (*Id.* at pp. 286, 289.) The developer had attempted various repairs to the project, but did not try to repair the drainage problem. The homeowners association argued it had only a single cause of action (i.e., for damages caused by "faulty construction and design"), and hence repairs to *any* defect tolled the statute of limitations on *all* claims for defects, including the drainage problem. (*Id.* at p. 287.) Rejecting that contention, the *Winston Square* court reasoned that distinct defects required separate treatment, such as being classified patent or latent, or in connection with statute of limitations accrual. The court therefore held that attempts to repair other problems, while tolling the statute of limitations as to those defects, did not toll the statute of limitations as to the distinct problem of drainage because the drainage problems were unrelated to the other areas of damage. (*Id.* at pp. 286-289.)

We are persuaded the reasoning of *Winston Square* compels rejection of the trial court's conclusion that manifestation of one defect demonstrates the project suffers from the generic defect of "faulty construction," and that later manifestations of distinct and unrelated problems are merely remanifestations of the same defect of "faulty construction." Instead, each set of distinct defects must be analyzed separately to determine whether Chu had knowledge of those defects at the time they sold the units.

 B. *Knowledge of a Defect Bars Third Party Liability Coverage to the Extent the Third Party's Damages are Caused by Known Defects, but Negligent Failure to Discover the Defect Does Not Bar Coverage*

■ As previously discussed, the purpose of third party liability insurance is to protect the insured against injuries to third parties neither expected nor intended by the insured. To the extent Chu knew of extant defects pre-sale, any injuries flowing therefrom would not be an unexpected or unintended consequence of selling defective units. (See *supra*, fn. 5.)

1982 when the soil subsidence problems manifested, that should have put the people . . . on notice that they were suffering a construction defect. [¶] The fact that later balconies began to go bad, doors didn't close and all the other plethora of problems are just simply further manifestations of the underlying causation. *And that is faulty construction*." (Italics added.)

However, if Chu did not have pre-sale knowledge of the defect, any injuries suffered would be an unexpected or unintended consequence of selling the units. This is the case even though Chu may have had notice of facts which would incite investigation by a reasonably prudent person, but nevertheless negligently failed to investigate and obtain actual knowledge of the existence of such defects. (Cf. *Easton* v. *Strassburger* (1984) 152 Cal.App.3d 90, 97-104 [199 Cal.Rptr. 383, 46 A.L.R.4th 521] [broker's failure to disclose facts not actually known to him, but which should have been known in the exercise of reasonable diligence, states negligence claim].) Since a major purpose of third party liability insurance is to protect the insured from claims for negligence (*Garvey* v. *State Farm Fire & Casualty Co., supra*, 48 Cal.3d 395, 407-408 [third party insurance draws on traditional tort concepts of fault and covers insured for negligence]), Chu's third party coverage is not forfeited merely because they should have known of the existence of defects but negligently failed to discover such defects.

The cases upon which Insurer relies do not establish a contrary rule, but instead either accord with our analysis (see, e.g., *Hogan* v. *Midland National Ins. Co., supra*, 3 Cal.3d at pp. 559-561; *Economy Lumber Co.* v. *Insurance Co. of North America, supra*, 157 Cal.App.3d at pp. 647-648) or are inapposite. The case on which Insurer principally relies, *Home Ins. Co.* v. *Landmark Ins. Co., supra*, 205 Cal.App.3d 1388, is inapplicable to this case. While *Home Insurance* did involve damage caused to realty by progressive deterioration from a single defect, *Home Insurance* analyzed first party, not third party liability insurance issues. As noted in *Garvey* v. *State Farm Fire & Casualty Co., supra*, third party claims involve different considerations and analyses than first party claims. *Home Insurance* did not address the question of whether the sale of a defectively constructed building, sold after damage had first become "manifest," could constitute "accidental" injury. If the seller lacked actual knowledge of the defect, even though he "should have known" but did not realize the damage through his negligence, could his conduct be an "accident?"

Other cases cited by Insurer are equally inapposite. Thus, for example, in *Advanced Micro Devices, Inc.* v. *Great American Surplus Lines Ins. Co.* (1988) 199 Cal.App.3d 791 [245 Cal.Rptr. 44], the court concluded there was no coverage because the insured *in fact* knew of the preexisting "defect," and was only uncertain as to the extent of the problem. (*Id.* at pp. 801-802.) *Advanced Micro Devices* did not deny coverage because the insured "should have known" of the defect, but because it actually knew of the defect. In reviewing the pertinent authorities, we find no cases denying third party liability coverage to an insured who sold property when he

"should have known" of the defect, but who through negligence was actually ignorant of the defect.

**V. There Are Triable Issues of Fact as to Whether Chu Knew Before He Sold the Units of the Defects Which Caused the Damage to the Third Parties**

■■■■ Some of the defects were known to Chu before they sold the units. Such defects included problems with the pool decking and driveway areas; poorly designed laundry facilities; problems in the heating and air-conditioning system; leaks in the unit balconies and windows; leaks in the interior plumbing; and cracks in the unit slabs. Chu concedes knowledge of these defects before selling the units prevents any resulting damage to third parties from being "accidental" injury covered by the policy, because the harm to such purchasers was expected and foreseen.

As to other defects for which coverage is sought, however, Insurer produced no evidence that Chu had pre-sale knowledge of such defects, and Chu claimed those problems were discovered *after* some or all of the units had been sold. Those defects included slope and water drainage problems; decaying stucco; problems with the tile roofing; problems with the exterior plumbing; beetle infestations in kitchen areas; etc. These problems appear distinct from and unrelated to the earlier discovered defects (see *Winston Square Homeowner's Assn.* v. *Centex West, Inc., supra*, 213 Cal.App.3d 282), and may have caused damage[7] postsale which was "accidental," i.e., neither intended nor expected. (See *Geddes & Smith, Inc.* v. *St. Paul Mercury Indemnity Co., supra*, 51 Cal.2d 558, 563-565; *Economy Lumber Co.* v. *Insurance Co. of North America, supra*, 157 Cal.App.3d 641, 647-648.)

The defects deemed most critical by the parties (i.e., deficiencies in the depth of the footings and the reinforcement of the slabs and footings) present a closer question. Chu professed ignorance of these defects, claiming to have discovered their existence after the sale of most or all of the units. The evidence introduced on summary judgment suggests Chu's first specific knowledge of the nature of the foundation defects (i.e., the use of so-called

---

[7]We use the term "may have caused damage" for the reason that difficult damage issues may well be encountered because of the posture of this case. For example, it may well be developed in subsequent proceedings that Chu had actual knowledge of the defective footing and slab conditions which caused the third party damages disputed herein. If these conditions ultimately caused the city to condemn the project, and Chu had pre-sale knowledge of their root causes, such knowledge would prevent resulting damage flowing therefrom from being "accidental." Also, if the damage attributable to "known" categories of defects caused the project to be a total loss, it is difficult to perceive what incremental additional damage could flow from "unknown" categories of defects which appear relatively minor in nature, such as beetle infestations or decaying stucco.

"shovel footings"; the absence of reinforced continuous footings in garage areas; the failure of the builder to follow plan specifications as to footings and slab construction) may have come from the County of Los Angeles's report describing these deficiencies, which report was not issued until *after* the units had been sold.

Insurer, however, argues there is no triable issue of fact as to Chu's pre-sale knowledge of these defective conditions because (1) Chu was aware of the expansive soil condition from the expert's 1982 report concerning the pool and driveway problems; (2) the 1983 lawsuit affirmatively alleged the foundations were inadequately designed and constructed for the expansive soil conditions; and (3) the 1983 lawsuit alleged the defects rendered the project uninhabitable and unsalable. ■ We review these contentions, mindful of the rather special rules which govern summary judgment motions.[8]

A. *The 1982 Report*

■ There are clearly triable issues of fact as to whether Chu knew of the existence of the footing and slab deficiencies merely because of knowledge of the 1982 problems, as knowledge of one set of problems does not equate with knowledge of unrelated defects. (See discussion, *supra*, at § IVA.)

There is no evidence Chu was informed, either by the 1982 reports themselves or during oral discussions surrounding the reports, that the footings or slabs *of the buildings* were defective. To the contrary, the 1982 reports attributed the 1982 set of problems to seepage of water into the underlying soils through cracks and poorly sealed joints. The suggested remedy was to remove some of the soils, replace same with some aggregate base, resaturate the expansive soils, reinforce any replacement decking with rebar, and properly seal the joints to prevent water seepage. While these "defects" do evidence deficiencies in the original construction, they are unrelated to the problems (i.e., sloping and water drainage problems; decaying stucco; problems with the tile roofing; problems with the exterior plumbing; beetle infestations in kitchen areas; building footings of inadequate design and/or construction to support the structural weight load, etc.) which surfaced

---

[8]Summary judgment is a "drastic" remedy, to be used with caution (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134]), and all doubts as to its propriety should be resolved in favor of the party opposing the motion. (*Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 183 [203 Cal.Rptr. 626, 681 P.2d 893].) Accordingly, the affidavits of the moving party are strictly construed, and the affidavits of the opposing party liberally construed (*Mann* v. *Cracchiolo, supra*, 38 Cal.3d at p. 35), therefore all reasonable inferences must be drawn in favor of the party opposing the motion. (*Neinstein* v. *Los Angeles Dodgers, Inc.* (1986) 185 Cal.App.3d 176, 179 [229 Cal.Rptr. 612].)

*after* Chu sold the units. The mere fact that "expansive soil" was a factor operating to create the 1982 damage does not automatically charge Chu with knowledge that the entire project was inadequately designed or constructed to withstand the forces of the expansive soil.[9]

### B. *The 1983 Lawsuit*

The 1983 lawsuit is characterized by Insurer as "the smoking gun," since the "admissions" contained in that lawsuit allegedly demonstrate Chu (1) had pre-sale knowledge that the project was uninhabitable and unsalable because of poor design and construction; and (2) had pre-sale knowledge of the root causes underlying the damages.

While the 1983 lawsuit did allege that unspecified "defects" rendered the units "unsalable" and "uninhabitable," Insurer attributes undue significance to this legal hyperbole. Insurer claims these "admissions" show Chu knew before they sold the units that the project's defective construction rendered it totally uninhabitable, and hence the injuries evidenced by the ultimate condemnation were expected and intended by Chu when they sold the units.

Certainly, the admissions contained in the 1983 lawsuit are admissible against Chu. While admissible, however, they are not conclusive, and the trier of fact is entitled to make findings contrary to the allegations of the prior proceedings. (*Oceanview Memorial Park* v. *Caminetti* (1943) 59 Cal.App.2d 703, 711 [139 P.2d 674].) Here, there is room for such contrary findings. While Chu alleged the units were "unsalable" and "uninhabitable" in 1983, there is evidence they may not have understood this condition to continue to prevail in 1984, since the units were in fact sold and inhabited in 1984. Whatever may have been Chu's knowledge as of 1983, it is their knowledge of the condition of the units when they were sold that is critical. Since the evidence indicates the units were being repaired for occupancy at a later date, a factual question is raised as to whether Chu believed, when they sold the units, the defects referenced in the 1983 lawsuit could be sufficiently remedied to remove the problems which had earlier led them to characterize the units as "uninhabitable."

The final "evidence" which Insurer claimed eliminated all triable issues of fact regarding Chu's pre-sale knowledge of the footing and slab

---

[9] Perhaps we should not characterize "expansive soil" as a defect. Our best understanding is that "expansive soil" is a site condition, and the evidence indicates such a condition is common to the areas surrounding this project and that the specific site suffered no particularly unique soils problems. We perceive that a project is not defective *because* of the soil conditions, but instead *can* be defective *if* adequate precautions (i.e., in grading, excavation, compacting, slab reinforcement, footing design and construction, etc.) are not taken to compensate for the soil condition.

deficiencies was the 1983 lawsuit's conclusory pleading that the "foundations and structures . . . were improper and unsuitable for the expansive soil . . . conditions of the property, . . . rendering all of the said structures unsteady, unstable and inadequate." Insurer further argues its expert's report demonstrates that the cause of damages currently being suffered by third parties is footings and slabs whose construction was inadequate in light of the expansive soils, i.e., the identical defect described in the 1983 lawsuit and thus known to Chu pre-sale.

Insurer's argument falters, however, because there is no evidence conclusively to demonstrate that the root causes of the postsale damages (i.e., the ad hoc addition of "shovel footings"; the use of unreinforced footings and slabs; etc.) are in fact "the identical defects described in the 1983 lawsuit." The conclusory nature of the 1983 pleading leaves undisclosed what Chu knew to be "improper and unsuitable" about the foundations. (See discussion, *supra*, at fn. 1.) While a trier of fact could well conclude from the 1983 pleadings that Chu in fact knew of the root causes of the postsale damages, there is equally room for the opposite conclusion—that Chu believed the "improper and unsuitable" character of the foundation was attributable to *different* defects, and that they believed these different defects could be repaired as the units were sold.

## VI. *Conclusion*

The issues in this case, while inherently complex because of the nature of construction defect litigation, are essentially factual in nature: "What did [they] know, and when did [they] know it?" The question of Chu's actual knowledge, at least on this record, presents too many triable issues of fact to permit its resolution on summary judgment. Accordingly, we are compelled to reverse the judgment and to remand for further proceedings.

Work, Acting P. J., and Todd, J., concurred.

Respondent's petition for review by the Supreme Court was denied December 12, 1990.